In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1372

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL J. BREIT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 04 CR 50024—**Philip G. Reinhard**, *Judge.*

ARGUED SEPTEMBER 15, 2005—DECIDED NOVEMBER 22, 2005

Before FLAUM, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* Michael Breit was charged in an indictment with unlawfully receiving explosive materials, in violation of 18 U.S.C. § 842(a)(3)(A), and receipt of explosive materials with intent that they would be used to kill, injure, or intimidate another individual, or to unlawfully damage or destroy any building, vehicle, or other real or personal property, in violation of 18 U.S.C. § 844(d). He was convicted on both counts after a jury trial, and he was sentenced to 41 months' imprisonment. Breit now challenges his convictions on appeal. For the reasons set forth below, we affirm in all respects.

## I.  HISTORY

On April 18, 2004, at approximately 9:00 p.m., Rockford, Illinois police department patrol officers Daniel Fick and Apostolos Sarantopoulos were separately dispatched to 3012 Sunnyside Drive in Rockford to investigate a weapons violation. Fick had been advised by the communication center that an anonymous female caller reported hearing a gunshot, that one of her neighbors (later identified as Breit) told her that he accidently fired a blank round from his rifle, and that this neighbor was acting weird. Fick and Sarantopoulos arrived at Breit's apartment complex at approximately the same time and attempted to locate Breit's apartment. Upon arriving at Breit's apartment door, but prior to the officers knocking, Breit came outside of his apartment and stated, "I screwed up."

The officers asked Breit if they could enter his apartment and talk to him. Breit agreed, and the officers entered the apartment. Once inside the kitchen area, the officers asked Breit what happened. Breit stated he was trying to dismantle his newly purchased AK-47 assault rifle. He did not realize there was a round in the rifle, and it fired during disassembly. Breit led the officers into the living room and showed them where the bullet traveled, which was through the patio door frame and out of the apartment. During this time, the officers noticed a large amount of ammunition on the kitchen table, as well as two handguns, one on a bookcase in the living room and one on top of the entertainment center. They also observed additional ammunition on top of the entertainment center. Breit stated the handgun on top of the entertainment center was loaded, and that it was a black powder handgun. At this time, Sarantopoulos quickly walked through the apartment to make sure that no one else was in the apartment and that no one had been injured.

Sergeant Danny Foltz, Fick's and Sarantopoulos's supervisor, then arrived. Upon being apprised of the situation, Foltz ordered Breit put in handcuffs "for everyone's protection." Approximately eleven minutes later, Fick read Breit his *Miranda* rights. Breit did not ask for an attorney and in fact was completely cooperative.

Foltz then asked Breit for permission to search the apartment as well as Breit's vehicle. Foltz stated he wanted permission to search "for any other guns or anything related to them." Breit orally agreed. Sarantopoulos retrieved two identical consent-to-search forms. Sarantopoulos removed Breit's handcuffs and gave Breit one copy of the consent form. Sarantopoulos kept the other form and read it to Breit verbatim. The form stated, "I, Michael Josiah Breit, knowingly and voluntarily give consent to City of Rockford police officers to conduct a complete search of the following." Breit's apartment and vehicle were then set forth on the form. The bottom of the consent form read, "These officers are authorized by me to seize property which they determine may pertain to a crime investigation they are conducting. I understand and have been informed by at least one of the undersigned officers that I have the right to refuse this consent." Breit did not ask any questions, and he signed both forms. Breit was removed from his residence and placed in a squad car.

The police then initiated their search. Sarantopoulos recovered a paintball gun and a journal from Breit's car. The journal was closed with a vinyl cover, and it had a velcro strap around it. Sarantopoulos had to use his flashlight to actually open the journal. The journal contained something of a "hit list" of Senators, government officials, and celebrities. Next to each name was the word "marked." In addition, the journal contained a drawing of a limousine that appeared to be under attack. In Breit's apartment, the police recovered five long guns, two

black powder pistols, a large amount of ammunition in various calibers, several books, and two notebooks. The two notebooks contained diagrams of rocket launchers and bombs, along with writings such as "Fight, fight, fight, kill, kill, kill." The various books recovered dealt with the making of explosives and drugs or espoused "political views of a terrorist nature." Finally, the officers recovered items consistent with bomb-making materials, such as threaded pipe, shotgun shells, black powder, and fuse cord.[1]

After Breit was indicted, the district court denied Breit's motions to suppress the evidence seized from his apartment and vehicle as well as his subsequent statements to police. The denials of the motions to suppress comprise the bulk of Breit's appeal. Breit also argues the district court's admission of his guns, ammunition, knives, sword, and books at trial was an abuse of discretion because this evidence was irrelevant and unfairly prejudicial.

## II.  ANALYSIS

### A.  *Probable Cause for an Arrest*

Breit first argues the police did not have probable cause to arrest him for the reckless discharge of a firearm. As a result, Breit's consent to search was invalid, and all evidence seized (and statements made) thereafter should have been suppressed, or so the argument goes. Because we have no trouble concluding there was probable cause for Breit's arrest, we need not reach the remainder of his argument on this particular issue.

Probable cause exists if, at the time of arrest, the officers possess knowledge from reasonably trustworthy informa-

---

[1] Although not entirely clear from the record, it appears the police recovered several knives and a sword at this time as well.

tion that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing, a crime. *United States v. Brown*, 366 F.3d 456, 458 (7th Cir. 2004) (citing *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003)); *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000). Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest. *Brown*, 366 F.3d at 458 (citing *United States v. Sholola*, 124 F.3d 803, 814 (7th Cir. 1997)). Because police officers are entitled to rely on their experience in assessing probable cause, their judgments deserve deference. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996)). Our review of the district court's determination of probable cause is de novo, while our review of the district court's findings of fact is for clear error. *Id.* (citing *Ornelas*, 517 U.S. at 699).

The applicable Illinois statute provides: "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5. Specifically, a person commits the offense of reckless discharge of a firearm when he (1) recklessly discharges a firearm; and (2) endangers the bodily safety of an individual. *People v. Collins*, 824 N.E.2d 262, 265 (Ill. 2005).

When Foltz arrested Breit,[2] Foltz had sufficient information before him to believe probable cause existed to arrest Breit for the reckless discharge of a firearm. First, a neighbor had called 911 to report a gunshot had been fired

---

[2] The court makes no determination as to whether Breit was arrested when he was handcuffed or eleven minutes later when he was read his rights. The determination is immaterial, as Foltz testified he learned of no new information during those eleven minutes.

from within Breit's apartment. Second, the neighbor reported Breit had been acting strangely. Third, the neighbor also indicated in that call that Breit had stated to her that he accidentally fired a blank round from a new gun, which was inconsistent with Breit's later statement that he fired a real bullet. Fourth, Breit met the officers at the door of his apartment and stated (with no provocation), "I screwed up." Fifth, Breit admitted accidentally firing his AK-47 while taking it apart. Sixth, the bullet actually exited Breit's apartment and traveled toward a neighbor's home directly behind his apartment. Finally, the police observed in plain view a large amount of ammunition, black powder, and fireworks, along with a loaded black powder pistol and a pellet gun.

Under these unusual circumstances, the police had sufficient knowledge to believe that Breit had committed a crime. In other words, there was probable cause for the arrest. While no one factor is determinative, it does at least appear reckless to disassemble an AK-47 without first ensuring that no rounds remained in the weapon, especially given the presence of other individuals in adjoining apartments. Furthermore, not only were other individuals potentially in harm's way, but Breit had endangered himself with bodily injury, which is sufficient under the statute. Combining this information with the fact that the rifle did discharge could properly lead to Breit's arrest. Although there may be a question as to whether Breit was in fact reckless, as opposed to simply negligent, we need not make that determination here. Our only role is to determine whether Officer Foltz had probable cause that night to arrest Breit for the reckless discharge of a firearm, and we easily conclude that he did.

## B.  Scope of Consent

Breit next argues that, even if his consent was valid, the subsequent search by the police exceeded the scope of

his consent. As Breit points out, Foltz testified he told Breit the police wanted to search for any other guns or anything related to them.[3] Breit argues this would not reasonably include a search for receipts and paperwork relating to guns that, in turn, allows the officers to retrieve and read Breit's private notebooks and journals. The government simply argues Breit's written consent was a general one, one that gave the police the authority to conduct a complete search of Breit's apartment and vehicle. The government's position completely ignores the discussion between Breit and the officers prior to his signing of the consent form. As will be seen, the resolution of the issue is more involved than what the government would have us believe.

As the Supreme Court has stated, "the scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citation omitted). We have explained how "[t]he scope of a consent search is limited by the breadth of actual consent[,] and [w]hether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994) (citations omitted). In *Torres*, we stated the standard as follows: "what would the typical reasonable person have understood [the scope of consent to be] by the exchange between the officer and the suspect?" *Id.* (citation omitted). Along the same lines, we have repeatedly emphasized that a general consent form does not override a more explicit statement specifying the object of

---

[3] Actually, at oral argument, Breit's attorney argued Foltz stated the police wanted to look for any other guns. Counsel made no mention of the phrase "or anything related to them," nor did the Government contest counsel's representation. However, a review of the record (and Breit's own briefs) makes clear Foltz's discussion with Breit included the phrase "or anything related to them."

the search. *See, e.g.*, *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002) ("Although the consent form is probative of the voluntariness of [the defendant's] consent, it helps little in determining its scope[,]" especially when the officer specified the object of the search.). While we review the district court's legal conclusions de novo, we review its finding of fact for clear error. *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003) (citation omitted).

As this court has recognized, "[g]overnment agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971); *United States v. Berke*, 930 F.2d 1219, 1222 n.7 (7th Cir. 1991); *see Lemmons*, 282 F.3d at 924; *cf. United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999). In *Dichiarinte*, we held that the personal papers of the defendant should have been suppressed. We found the police had exceeded the scope of the defendant's consent to search his home for narcotics when they read and seized his personal papers. *Id.* at 130. The papers were not related to narcotics; rather, they implicated the defendant in tax fraud. *Id.* The officers exceeded the scope of the defendant's consent when they went beyond what was necessary to determine if he had hidden narcotics among his personal papers and started to read the papers to determine whether they evidenced other illegal activity. *Id.*

The instant case is quite different than *Dichiarinte* and similar cases that Breit relies upon. First, Breit signed a clearly-worded consent form that gave the police permission to search his entire apartment and vehicle.[4] One of

---

[4] We note this is but one factor among many, and is by no means determinative. Furthermore, this should not be read to

(continued...)

the officers even read the consent form verbatim to Breit prior to Breit signing it. Furthermore, although not relied on specifically by the district court, Fick testified he told Breit they were searching for anything related to criminal activity, not just evidence related to guns. We believe, given this information, a reasonable person would have understood that a broader scope of consent had been given than what Breit now argues.

More important, however, is the analysis contained in *United States v. Raney*, 342 F.3d 551 (7th Cir. 2003). It contains a useful discussion on the issue presented here. In that case, the defendant signed written consent forms authorizing the police to search his car, residence, and other items for materials "in the nature of" child abuse, child exploitation, and child erotica. *Id.* at 554. The defendant argued that the seizure of homemade *adult* pornography exceeded the scope of his consent. *Id.* at 556 (emphasis added). We held the evidence should not be suppressed because "[t]he use of the 'in the nature of' phrase broaden[ed] the scope of the search . . . ." *Id.* at 558.

In making this determination, we also relied on the following hypothetical: "[H]ad the agents in *Dichiarinte* obtained consent to search for evidence 'in the nature of' narcotics, the search would have been broad enough to include the seizure of drug paraphernalia, scales, and even drug ledgers; *such language also would have enabled the agents to read the defendant's private papers* and seize them if they discovered some link to narcotics." *Id.* (emphasis added). We then explained that the homemade adult pornography could reasonably be construed to be evidence "in the nature of" child abuse, child erotica,

---

[4] (...continued)
imply we are expanding or otherwise modifying the general rules explained in *Torres* and *Lemmons*.

or child exploitation, given the "broad nature" of the consent. *Id.* Applying this reasoning to the instant case, we conclude Breit's consent was also of a broad nature, as it (at a minimum) allowed the police to search for anything "related to" guns. We find the phrase "related to" in this context to be equivalent to the phrase "in the nature of," which was used to modify the consent given in *Dichiarinte*. Thus, when Breit consented to a search for guns "or anything related to them," he consented to a search of his private papers, which included notebooks and journals.

One final point needs to be addressed on this issue. In general, we agree with the district court's reasoning as to why a search of Breit's notebooks and journal was in fact "related to" guns. More importantly, we find, based on the information contained in the record, that it was not clearly erroneous for the district court to conclude as it did. As for the notebooks, they may have uncovered relevant and useful information, such as receipts, completed forms, or a personal inventory of all of Breit's guns. It may have also revealed whether Breit possessed owner's manuals for the guns. Searching for this type of information was permissible because it was "related to" the search for guns. In addition, there may have been other guns, either hidden or out of sight. A review of the notebooks could reasonably have revealed the possible presence or location of such guns. As a result, the police had the authority to look where such paperwork might be found, which included Breit's notebooks.

A closer question is presented with respect to Breit's personal journal. The reasons used above to support the search of the notebooks apply equally to the search of the journal as well. However, due to the intimate nature of the journal (which was evident from its appearance and from the presence of the velcro strap), further discussion is warranted. Given the unique circumstances of

this case, the police could also look in Breit's journal not only for the appropriate paperwork, but also for information detailing how Breit intended to use his arsenal of weapons. This was a legitimate question and was within the scope of Breit's consent, given his discussion with the officers as well as the presence of the number and types of firearms, explosives, and other weapons in plain sight, along with the report that Breit had been acting strangely. In sum, given what the police had heard and seen during the course of their investigation of this case, they did indeed have the authority to search Breit's personal journal.

*C. Other Evidence*

Breit's final argument is that his lawful possession of guns, ammunition, knives, a sword, and publications should not have been admitted at trial because they were irrelevant and unfairly prejudicial. We review challenges to the admission of evidence only for an abuse of discretion. *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (citation omitted).

As previously indicated, Breit was charged in Count 2 of the indictment with the receipt of explosive materials with the intent that they would be used to kill, injure, or intimidate another individual, or to unlawfully damage or destroy any building, vehicle, or other real or personal property, in violation of 18 U.S.C. § 844(d). In arguing that the firearms, ammunition, and publications were indeed relevant, the government relies heavily on the case of *United States v. Kimberlin*, 805 F.2d 210 (7th Cir. 1986). In *Kimberlin*, the defendant was charged with several crimes, including maliciously damaging by explosion the property of an entity receiving federal financial assistance. *Id.* at 215. As the government sees it, this court upheld the admission of the defendant's possession of several firearms, as well as a large amount of ammunition,

to establish his intent with respect to that charge. The government mistakes our analysis in *Kimberlin*, however. The firearms and ammunition the government refers to were actually admitted at trial without objection and were thus not a part of the analysis that the government now quotes in its argument. *See id.* at 235.

As it turns out, though, *Kimberlin* is still useful for resolving this case. We did have to analyze in *Kimberlin* whether possession of a pistol with a silencer was relevant to the intent necessary to convict on the explosives charges. *Id.* Unlike the firearms and ammunition, there was an objection at trial to admitting the pistol with a silencer, and we ruled on the issue. *Id.* We found the possession of the pistol with a silencer was "at least marginally relevant" to the intent issue. *Id.* If one pistol with a silencer was at least marginally relevant in *Kimberlin*, then we have no trouble concluding two replica black powder handguns, five long guns (some of which had been altered for possible easier concealment), and thousands of rounds of ammunition were at least marginally relevant to Breit's intent to carry out a bombing and were not unfairly prejudicial. *See also United States v. Best*, 250 F.3d 1084, 1091 (7th Cir. 2001) (explaining that the government may introduce evidence of other acts to prove intent when a defendant is charged with a specific intent crime because intent is necessarily an issue); *United States v. Gellene*, 182 F.3d 578, 595 (7th Cir. 1999) (same); *United States v. Lewis*, 110 F.3d 417, 420 (7th Cir. 1997) (same).

It is important to note Breit simply lumps the guns, knives, sword and literature together when he makes his argument, as if they were all the same type of evidence. By not separating his arguments for these different types of evidence, Breit has not fully developed his arguments with respect to the knives, sword, and literature, and we need not consider them. *See Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir. 1984) (refusing to consider issues

presented in a perfunctory and underdeveloped manner) (citations omitted). Furthermore, without the specifics as to how these items were not relevant or unfairly prejudicial, we are unable to discern how their admission would constitute an abuse of discretion. Moreover, even if outside the district court's discretion, it would have been harmless error, given the guns and ammunition were relevant (and not unfairly prejudicial) and rightfully admitted, as well as the overall strength of the government's case without this evidence. *See United States v. Reed*, 259 F.3d 631, 634 (7th Cir. 2001) (in harmless error analysis, defendant's conviction will only be reversed if district court's decision "had a substantial influence over the jury and the result reached was inconsistent with substantial justice" (quotations omitted)); *see also United States v. Manske*, 186 F.3d 770, 779 (7th Cir. 1999).

### III.  CONCLUSION

We conclude that the district court properly denied the motions to suppress, that there was probable cause for Breit's arrest, that the search of Breit's apartment was proper, and that the evidence admitted at trial was proper. The jury's verdicts will not be disturbed, and the convictions are AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*