# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-2678

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RICARDO VILLEGAS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 272—**J. P. Stadtmueller,** *Judge.*

———————

ARGUED APRIL 2, 2007—DECIDED JULY 27, 2007

———————

Before RIPPLE, ROVNER and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Ricardo Villegas was indicted on one count of illegal re-entry into the United States after having been deported previously on account of two aggravated felony convictions, *see* 8 U.S.C. § 1326(b)(2), and one count of intentional possession of marijuana, *see* 21 U.S.C. § 844. Mr. Villegas moved to suppress evidence of his identity as the product of an unlawful arrest and detention. A hearing was held before a magistrate judge who recommended denial of Mr. Villegas' motion. When Mr. Villegas objected to the magistrate judge's recommendation, the district court reviewed Mr. Villegas' motion

de novo at a combined hearing on that motion and bench
trial. The district court denied the motion and found Mr.
Villegas guilty on both counts. Mr. Villegas now appeals
the district court's denial of his motion to suppress. For
the reasons set forth in this opinion, we believe that the
district court correctly determined that Mr. Villegas' arrest
did not violate the Fourth Amendment and therefore
committed no error in admitting the evidence. Accord-
ingly, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Officers Thomas Obergon and Michael Lutz were both
assigned to the Milwaukee Police Department's ("MPD")
Gang Squad and knew Mr. Villegas and Ephraim Munoz
to be members of the Mexican Posse. They also knew that
Munoz was wanted in connection with a homicide. In
addition, as part of his regular investigation of gang
members, Officer Obergon had learned from the United
States Department of Homeland Security ("DHS") that Mr.
Villegas had been deported previously on account of his
status as an aggravated felon. Officer Obergon also had run
Mr. Villegas' name through the National Crime Informa-
tion Center ("NCIC"), and had received confirmation of
Officer Obergon's information. The NCIC report also noted
that Mr. Villegas was wanted by the Bureau of Immigra-
tion and Customs Enforcement ("ICE") through an appre-
hension request to local law enforcement.

On August 20, 2004, Officers Obergon and Lutz received
a call from an off-duty MPD officer, informing them that

Munoz and Mr. Villegas had been seen drinking beer outside of a building at 4955/4957 South 14th Street. That building was a two-story duplex owned by Mr. Villegas' sister, Maria Ventura. One unit of the duplex was situated on the first floor; another unit occupied the second floor. Mr. Villegas and his sister lived in the first floor unit.

The second floor unit was occupied by May and John Franklin. The Franklins had lived in that unit for twenty-three years and were unrelated to Ventura and Mr. Villegas. May Franklin ran a small business from her home, selling dolls, crafts, men's clothing and other assorted items. She advertised the business by a sign in front of the duplex, which listed a phone number and invited prospective customers to call for an appointment.

The duplex had two entrances. These entrances were adjacent to one another on the southeast corner of the building: one on the eastern corner of the building's southern exposure and one on the southern corner of the building's eastern exposure. Each entrance had a solid wood inner door and an outer screen door. The entrances led into a small common hallway that provided access to the first floor unit where Mr. Villegas and his sister lived, a staircase leading to the Franklins' second floor unit and a staircase leading down to a basement. Each unit was closed to the common hallway.

When Officers Obergon and Lutz learned that Munoz and Mr. Villegas had been seen outside the duplex, they, along with other MPD officers, proceeded to the area and assembled at a location near the duplex. At some point, Officer Obergon told Officer Lutz that Mr. Villegas was a previously deported aggravated felon and that ICE had issued an apprehension request. Officer Obergon then left the assembly point in an unmarked police car to confirm

that Munoz and Mr. Villegas were indeed outside
4955/4957 South 14th Street. When Officer Obergon passed
the address, he saw Munoz and Mr. Villegas outside the
home drinking beer. He recognized both men on sight
from his prior investigations. Officer Obergon notified the
other MPD officers that Munoz and Mr. Villegas were
outside the duplex and, in order to avoid detection,
proceeded down the street to park his vehicle.

When Officer Lutz and the other MPD officers reached
the duplex, neither Munoz nor Mr. Villegas was outside.
The officers surrounded the building, and Officer Lutz took
up a position near one of the entrances. When Officer Lutz
arrived at the entrance, the inner doors of both entrances
were open and the screen doors, while closed, were
unlocked. Officer Lutz heard another officer shout that
somebody had tried to exit the building through a window,
but had reentered the building. Officer Lutz then entered
the common hallway.

As Officer Lutz entered the common hallway, Mr.
Villegas exited the first floor unit into the common hall-
way. Officer Lutz recognized Mr. Villegas on sight based
on a picture the officer had seen of Mr. Villegas earlier that
day. Officer Lutz identified himself as a police officer,
addressed Mr. Villegas by name and told Mr. Villegas that
he was under arrest. While outside the first floor unit and
upon hearing Officer Lutz, Mr. Villegas dropped a small
clear bag whose contents, upon visual inspection, Officer
Lutz suspected to be marijuana. Officer Lutz again told
Mr. Villegas that he was under arrest and reached for the
defendant's arm. Mr. Villegas resisted, shoving Officer
Lutz into a wall or the doorway to the unit, and attempted
to reenter the first floor unit. Officer Lutz called for assis-
tance and was joined by a second MPD officer. Mr. Villegas

continued to resist arrest and the three men, Mr. Villegas, Officer Lutz and the second MPD officer, fell into the first floor unit. At some point in the struggle, Mr. Villegas wrestled free of Officer Lutz and kicked him in his midsection. When the officers finally were able to place Mr. Villegas in handcuffs, he continued to resist the officers, spitting blood and mucus at them, some of which landed on Officer Lutz's arm.

After the arrest, Mr. Villegas was taken to the Milwaukee County jail. His booking in the Milwaukee County jail caused a notice to be sent to ICE Special Agent Ronald Rickey. About a month earlier, Agent Rickey had received information that Mr. Villegas had reentered the United States and might be in the Wisconsin area. Upon receiving this information, Agent Rickey had ordered Mr. Villegas' alien registration file, or "A file," which included a fingerprint card and a picture of Mr. Villegas. Agent Rickey then matched the fingerprints in the A file to fingerprints taken by the MPD after a prior arrest of Mr. Villegas.

As a result of the notice received following Mr. Villegas' August 20, 2004 arrest, Agent Rickey went to the Milwaukee County jail on August 23, 2004 to interview Mr. Villegas. Upon his arrival, Agent Rickey recognized Mr. Villegas from the photograph in his A file. Although Mr. Villegas had been booked under the name Douglas Enrique Villegas, one of Mr. Villegas' known aliases, he responded to Agent Rickey when the agent addressed him as Ricardo. Agent Rickey then read Mr. Villegas his *Miranda* rights, which Mr. Villegas acknowledged. Mr. Villegas declined the presence of counsel. Agent Rickey then proceeded to interview Mr. Villegas about his background. The answers that he provided were consistent with the information in his A file. The interview lasted about fifteen minutes and

ended when Mr. Villegas stated that he did not wish to answer any further questions.

## B.

Mr. Villegas was charged in a two-count indictment. The first count charged him with illegal reentry into the United States in violation of 8 U.S.C. § 1326(b)(2);[1] the second

---

[1]  8 U.S.C. § 1326 provides, in pertinent part:

(a) In general

Subject to subsection (b) of this section, any alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under title 18, or imprisoned not more than 2 years, or both.

(b) Criminal penalties for reentry of certain removed aliens

Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—

(continued...)

count charged him with the knowing and intentional possession of marijuana in violation of 21 U.S.C. § 844. The latter charge was based on the marijuana found in the bag dropped by Mr. Villegas at the time of his arrest.

Mr. Villegas moved to suppress, as the fruits of an unlawful seizure, both the statements about his identity that he had made to Agent Rickey after his arrest and the marijuana that had been found at the time of his arrest. He contended that his Fourth Amendment right, made applicable to the states by the Fourteenth Amendment, to be free from unreasonable searches and seizures had been violated when Officer Lutz entered the common hallway of the duplex without a search warrant. The district court referred the motion to a magistrate judge who recommended that the motion be denied because Officer Lutz's entry into the duplex fell within the exigent circumstances exception to the Fourth Amendment's warrant requirement.

Mr. Villegas filed an objection to the magistrate judge's recommendation. The district court then held a joint hearing at which it conducted both a de novo hearing on Mr. Villegas' suppression motion and a bench trial. At the conclusion of this proceeding, the district court denied Mr. Villegas' motion to suppress. The court concluded that, because Mr. Villegas had no legitimate expectation of

---

[1] (...continued)

. . .

> (2) whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 20 years, or both[.]

privacy in the common hallway, Officer Lutz's entrance into the common hallway without a warrant had not violated Mr. Villegas' Fourth Amendment rights. The district court further noted that it did not believe that, under *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), the Fourth Amendment's exclusionary rule would require release of Mr. Villegas after his identity had been established by fingerprints or other records. The district court then found Mr. Villegas guilty on both counts of the indictment.[2]

Mr. Villegas now appeals the decision of the district court denying his motion to suppress his statements to Agent Rickey as the fruit of an unlawful seizure.

## II

## DISCUSSION

In reviewing the district court's decision with respect to a motion to suppress, we review the district court's findings of fact for clear error and its legal determinations de novo. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

Mr. Villegas contends that Officer Lutz's entry into the common area of the duplex without a warrant violated the Fourth Amendment's prohibition against warrantless searches and seizures. He submits that, but for the unlawful entry and subsequent arrest, the Government would have had no evidence of his identity and that, without that evidence, it would not have been possible to convict him

---

[2] The Government subsequently moved to set aside Mr. Villegas' conviction on Count II of the indictment. The district court granted the motion.

for unlawful reentry into the United States. The Government offers in reply three separate grounds that, in its view, support the decision of the district court. First, the Government contends that Mr. Villegas had no legitimate expectation of privacy in the common area of the duplex; therefore, Officer Lutz's warrantless entry into that area did not violate the Fourth Amendment. Next, the Government submits that, even if Officer Lutz's entry into the common area of the duplex violated Mr. Villegas' Fourth Amendment rights, the arrest and subsequent detention of Mr. Villegas were not unlawful because the arrest was supported by probable cause. Because there was probable cause for the arrest, the Government continues, any statements made by Mr. Villegas outside of the duplex in the course of his detention do not fall within the Fourth Amendment's exclusionary rule. Lastly, the Government submits that, even if Officer Lutz violated Mr. Villegas' Fourth Amendment rights and there was no probable cause to support his arrest and continued detention, evidence pertaining to Mr. Villegas' identity does not fall within the Fourth Amendment's exclusionary rule.

We shall address the first two of the Government's contentions. However, because we conclude that, under the circumstances, Officer Lutz's warrantless entry into the duplex's common areas did not violate Mr. Villegas' Fourth Amendment rights, and that, in any event, Mr. Villegas' continued detention was lawful because it was supported by probable cause, we need not address the Government's contention that identity evidence does not fall within the strictures of the Fourth Amendment's exclusionary rule.

**A.  Officer Lutz's Warrantless Entry into the Duplex**

The Fourth Amendment protects against warrantless intrusions by the government into areas in which that individual holds a reasonable expectation of privacy. *Yang*, 478 F.3d at 835. The district court determined that, because Mr. Villegas had no legitimate expectation of privacy in the duplex's common hallway, Officer Lutz's warrantless entry into that area did not violate the Fourth Amendment.

A defendant seeking to suppress the fruits of a search bears the burden of demonstrating both that he held an actual subjective expectation of privacy and that the expectation "is one that society is prepared to recognize as reasonable." *Id.* In determining whether a defendant held a subjective expectation of privacy, we look at the defendant's efforts to conceal and keep private that which was the subject of the search. *Id.* To say that society is prepared to recognize an expectation of privacy as reasonable "recognizes the everyday expectations of privacy that we all share." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). Thus, our inquiry into whether a defendant's expectation of privacy was reasonable is necessarily fact dependent, *see United States v. Smith*, 978 F.2d 171, 180 (5th Cir. 1992), and "whether a legitimate expectation of privacy exists in a particular place or thing" must be determined on a case-by-case basis, *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005).

Mr. Villegas has not demonstrated a subjective expectation of privacy with respect to the common hallway. Nor has he shown that any subjectively held expectation of privacy that he might hold with respect to that hallway is one that society is prepared to recognize as reasonable. Although Ventura testified that the solid outer doors leading to the common hallway normally were kept closed

and locked, on the day in question, those doors were open. Indeed, Officer Lutz testified that he could see into the common hallway through a screen door, which itself was unlocked. Exposing the activities within the common hallway to the world is inconsistent with a subjective expectation of privacy, particularly when the other occupants of the duplex, the Franklins, ran a business from the property that was advertised by a sign in front of the building.

Even if Mr. Villegas held a subjective expectation of privacy with respect to the common hallway, the facts of this case and our precedents reveal that such an expectation would not be "one that society is prepared to recognize as reasonable." *Yang*, 478 F.3d at 835. First, the common hallway was the sole regular access to both units in the duplex. Anyone desiring access to the Franklins' home, including the Franklins' customers and, indeed, the Franklins themselves, had to pass through that hallway to reach the Franklins' unit. *See United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001) (noting that tenants in multi-family housing buildings lack a reasonable expectation of privacy in common areas of the buildings); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding that the defendant had no reasonable expectation that his activities in an apartment building's common entrance would remain his secret). Nor did Mr. Villegas present any evidence that suggests that he and his sister were related to the Franklins, such that the duplex in its entirety should be considered a single dwelling; indeed, the evidence of record supports the opposite conclusion. *But cf. United States v. King*, 227 F.3d 732, 749-50 (6th Cir. 2000) (finding a reasonable expectation of privacy in a common basement accessible only by invitees of a duplex's tenants and where

all of the tenants were family members). We have held previously that circumstances such as the one detailed in this record are inconsistent with a legitimate expectation of privacy. *See Concepcion*, 942 F.2d at 1172 (holding that tenants have no reasonable expectation of privacy in the common areas of an apartment building); *see also Espinoza*, 256 F.3d at 723 (noting "considerable tension" between a district court's ruling applying the knock and announce rule of *Wilson v. Arkansas*, 514 U.S. 927 (1995), to the common area of a duplex and our prior holdings that tenants in multi-family housing units lack a legitimate expectation of privacy in common areas in which landlords and co-tenants may admit freely outsiders).

Mr. Villegas points to a number of cases from other courts of appeals holding that the defendant had a legitimate expectation of privacy in a common area of a duplex or other small multi-family dwelling.[3] We believe that these

---

[3] The primary cases to which Mr. Villegas points are *United States v. King*, 227 F.3d 732 (6th Cir. 2000), *United States v. Fluker*, 543 F.2d 709 (9th Cir. 1976), and *Fixel v. Wainwright*, 492 F.2d 480 (5th Cir. 1974).

In *King*, the Sixth Circuit concluded that the defendant had a legitimate expectation of privacy in the shared basement of a duplex. 227 F.3d at 749-50. Although the court in *King* relied on Sixth Circuit precedent holding that tenants in an apartment building had a legitimate expectation of privacy in common areas not open to the public, *id.*, the court first noted that the ultimate determination of whether a defendant has a legitimate expectation of privacy in a particular place must be determined on a case-by-case basis, *id.* at 744. The court then looked to the facts in that particular case in addition to circuit precedent to determine whether the defendant there had a reasonable expectation of privacy. *Id.* at 749-50.

(continued...)

3 (...continued)

The facts of *King* highlight the fact-specific inquiry into a reasonable expectation of privacy. Both units of the duplex involved in *King* were occupied by members of a single family: The defendants, who were brothers, lived in one unit while their mother and siblings lived in another. *Id.* at 750. Thus, the housing unit in *King* more closely resembled a single family house than a duplex. Further, the area in question in *King* was the basement of the building accessible only to the tenants, not a common hallway through which any visitor would pass to reach either of the dwelling units.

In *Fluker*, the Ninth Circuit determined that the defendant held a legitimate expectation of privacy in a common hallway of a duplex that normally was locked to outsiders. 543 F.2d at 712. The court emphasized that its inquiry into the defendant's legitimate expectation of privacy focused on "the particular circumstances of th[e] case." *Id.* at 716. After concluding that, under those circumstances, the defendant held a legitimate expectation of privacy in the common hallway, the court added that its holding was confined to the facts of that case. *Id.* at 717. Unlike the present case, the facts of *Fluker* reveal that the residents of both units in the duplex were co-conspirators in a heroin distribution operation. *Id.* at 712. In that sense, the occupants had a common interest in maintaining the privacy of the common hallway. Therefore, it would not be unreasonable for each occupant to conclude that the others would maintain the privacy of all occupants of the duplex to advance their common purpose.

In *Fixel*, the Fifth Circuit concluded that the defendant had a legitimate expectation of privacy in a fenced, common backyard shared by the units of a four-unit, multi-family dwelling. 492 F.2d at 484. The yard was accessible only by passing through a dwelling unit. *Id.* In reaching this conclusion, however, the court expressly distinguished the yard from common hallways

(continued...)

cases simply emphasize the fact-dependent nature of the
inquiry into the reasonableness of an individual's expecta-
tion of privacy in a particular place. Under the facts of this
case, Mr. Villegas clearly had no legitimate expectation of
privacy in the common hallway of the duplex.

## B. Probable Cause for Arrest

The Government further contends that, even if we
assume, arguendo, that Mr. Villegas was seized in an area
in which he had a legitimate expectation of privacy,
evidence of Mr. Villegas' identity obtained in the course of
his detention following his arrest and as a result of his
statements to Agent Rickey does not fall within the Fourth

---

[3] (...continued)
used by other tenants or outsiders to access individual units. *Id.*
The court noted that, unlike a common hallway or entrance, the
back yard was not accessible to anyone who wished to approach
the building's tenants. The court further noted that the yard
itself was surrounded by a fence, rendering the yard compara-
tively more removed and private than a common hallway. *Id.*
Taking these factors as a whole, the court concluded that the
defendant's privacy had not been so diluted by the fact that he
shared the yard with other tenants of the building as to render
his expectation of privacy unreasonable. *Id.*

The yard in *Fixel* is readily distinguishable from the common
hallway in the present case. As noted earlier, any visitor to either
unit, including delivery persons, solicitors and customers of
May Franklin's business, would pass through the common
hallway to reach either unit. Given the comparative openness of
the common hallway, the hallway lacked the same degree of
remove and privacy from the building's visitors as the yard in
*Fixel.*

Amendment's exclusionary rule because there was proba-
ble cause for his arrest.

The exclusionary rule vindicates an individual's entitle-
ment to shield his person, house, papers and effects, from
the Government's scrutiny until a valid warrant has issued.
*Hudson v. Michigan*, 547 U.S. ___; 126 S. Ct. 2159, 2165
(2006). However, because the exclusionary rule visits
penalties upon the Government, and hence the public at
large, on account of an officer's violation of the law,
application of the exclusionary rule "must bear some
relation to the purposes which the law is to serve." *New
York v. Harris*, 495 U.S. 14, 17 (1990) (quoting *United States
v. Ceccolini*, 435 U.S. 268, 279 (1978)) (internal quotation
marks omitted). The rule of *Payton v. New York*, 445 U.S. 573
(1980), which prohibits the warrantless, nonconsensual
entry into an individual's home to make an arrest, is
"designed to protect the physical integrity of the home."
*Harris*, 495 U.S. at 17. Because it is the absence of probable
cause, not the absence of a warrant, that renders unlawful
the custody of an individual by the Government, continued
detention of a suspect following an arrest inside his home,
but supported by probable cause, is not rendered unlawful
by the absence of a warrant. *Id.* at 18-19. Therefore, the
Supreme Court held in *New York v. Harris*, 495 U.S. 14
(1990), that the exclusionary rule does not apply to state-
ments made by a defendant while in custody outside of the
home when the police have probable cause to arrest the
suspect, even though the arrest itself may violate *Payton. Id.*
at 21.

Probable cause exists when, at the time of arrest, the
arresting officer possesses "knowledge from reasonably
trustworthy information that is sufficient to warrant a
prudent person in believing that a suspect has committed,

or is committing a crime." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005). Whether a police officer acted on probable cause is determined "based on the common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *Id.*

At the time of the arrest, Officer Lutz had probable cause to arrest Mr. Villegas for violation of 8 U.S.C. § 1326(a) and (b). An individual violates § 1326(a) when, after having been deported previously, he is found in the United States without first having obtained the consent of the Attorney General to apply for readmission before reembarking for the United States. 8 U.S.C. § 1326(a). On the day of Mr. Villegas' arrest and prior to the arrest, Officer Lutz had been told by Officer Obergon that there was an immigration apprehension request for Mr. Villegas' arrest because he had reentered the United States illegally after having been deported previously as an aggravated felon. Officer Obergon also had showed Officer Lutz a picture of Mr. Villegas. Officer Obergon had obtained this information in the course of an investigation into Mr. Villegas' involvement with the Mexican Posse, an inquiry he had conducted as a part of his duties as a member of the MPD's Gang Squad. Officer Obergon also had learned of this apprehension request in the course of his investigation. Absent any reason to believe otherwise, Officer Lutz was entitled to deem reliable the information received from his fellow officer. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (noting that officers effecting an arrest need not know all of the facts that constitute probable cause when they reasonably act at the direction of another officer).

Thus, at the time Officer Lutz saw Mr. Villegas, Officer Lutz had trustworthy information from a reliable source,

Officer Obergon, that Mr. Villegas had been deported previously and had not obtained the permission of the Attorney General to reenter the United States. When Officer Lutz saw Mr. Villegas in the hallway, Mr. Villegas was "found in[] the United States." Therefore, based on the reliable information received from Officer Obergon and Officer Lutz's own observations, Officer Lutz had probable cause to believe that Mr. Villegas had violated 8 U.S.C. § 1326(a).

Thus, there was probable cause to support Mr. Villegas' arrest, which rendered his continued detention lawful.[4]

---

[4] We note further that, in addition to Mr. Villegas' violation of 8 U.S.C. § 1326(a) and (b), at the time Mr. Villegas was arrested and taken from the duplex, Officer Lutz had probable cause to believe Mr. Villegas had violated at least four other Wisconsin state laws. First, Officer Lutz had probable cause to believe that Mr. Villegas had violated state law when he saw the object Mr. Villegas had dropped when Officer Lutz first told him that he was under arrest. *See* Wis. Stat. § 961.41(3g)(e). Officer Lutz testified that when he looked at the clear bag Mr. Villegas had dropped, its contents appeared to be marijuana. Officers are entitled to rely on their experience in determining whether probable cause exists. *See United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005). Second, after Mr. Villegas kicked Officer Lutz in the midsection, Officer Lutz had probable cause to believe that Mr. Villegas had committed the offense of battery of a police officer, regardless of whether Officer Lutz had acted with lawful authority when he attempted to arrest Mr. Villegas. *See* Wis. Stat. § 940.20(2); *see also State v. Barrett*, 291 N.W.2d 498, 500-01 (Wis. 1980). Third, when Mr. Villegas spat blood and mucus on Officer Lutz, Officer Lutz had probable cause to believe that Mr. Villegas had committed the offense of throwing or discharg-
(continued...)

*Harris*, 495 U.S. at 21. Therefore, any statements made by Mr. Villegas to Agent Rickey at the county jail are not subject to the Fourth Amendment's exclusionary rule. *See id.*; *see also United States v. Roche-Martinez*, 467 F.3d 591, 594 (7th Cir. 2006) (holding that evidence of an alien's identity obtained while the alien was in custody following an arrest pursuant to an unlawful entry did not fall within the exclusionary rule).

## Conclusion

Mr. Villegas had no legitimate expectation of privacy in the common hallway of the duplex. Thus, Officer Lutz did not violate Mr. Villegas' Fourth Amendment rights by entering the common hallway and arresting Mr. Villegas without a warrant. Further, Mr. Villegas' arrest and continued detention were supported by probable cause. Consequently, the statements by Mr. Villegas to Agent Rickey while in custody are not subject to the Fourth Amendment's exclusionary rule, regardless of whether Officer Lutz violated Mr. Villegas' Fourth Amendment rights by entering the common hallway and arresting Mr. Villegas without a warrant. The judgment of the district court is affirmed.

AFFIRMED

---

[4] (...continued)

ing bodily fluid at a public safety worker. *See* Wis. Stat. § 941.375(2). Lastly, assuming that Officer Lutz believed he was acting with lawful authority when he attempted to arrest Mr. Villegas, by struggling with the officers, Mr. Villegas gave Officer Lutz probable cause to suspect that Mr. Villegas had committed the offense of resisting or obstructing an officer. *See* Wis. Stat. § 946.41(a).

ROVNER, *Circuit Judge*, concurring in part and concurring in the judgment. I join all but section II(A) of the court's opinion, in which the court sustains Officer Lutz's warrantless entry into the duplex on the ground that Mr. Villegas had no legitimate expectation of privacy in the duplex's common hallway. *Ante* at 10-14. Although the court's analysis on that point is consistent with prior holdings of this circuit and certain of our sister circuits, I respectfully decline to join it for two reasons.

First, it is unnecessary for us to decide whether Mr. Villegas had a cognizable expectation of privacy in the duplex hallway. As we proceed to hold in section II(B) of today's decision, even if Officer Lutz violated Mr. Villegas's Fourth Amendment rights by entering the hallway without a warrant, that violation would not compel the suppression of the statements that Mr. Villegas subsequently made as to his identity. The probable cause that Officer Lutz had to arrest Mr. Villegas supported his post-arrest detention even if it did not support the officer's warrantless entry into the duplex to make the arrest. Consequently, the statements that Mr. Villegas made while in custody were not subject to the exclusionary rule. *Ante* at 16-18.

Second, I find the line of cases categorically rejecting any Fourth Amendment protection for the hallways and other common areas of multi-unit residential buildings, *see ante* at 11-12, to be conceptually problematic. Essentially, these cases reason that because the resident of a multi-unit building does not have exclusive access to and control over a common hallway, but rather shares that hallway with other building residents and their guests, he can have no reasonable expectation of privacy in the hallway. *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991); *see also United States v. Miravalles*, 280 F.3d 1328,

1331-32 (11th Cir. 2002) (collecting and summarizing cases). But the relevant question, it seems to me, is not whether the hallway is accessible to other residents and their invitees, but whether the hallway is accessible to the public at large. When the common hallway of a multi-unit building is secured, as Mr. Villegas alleges that his duplex's entry hall typically was, a resident of that building reasonably may expect that a non-resident—including a police officer—can lawfully enter the building only with the permission of himself or another resident. That expectation is comparable to the expectation of privacy held by people who live together in a single home. We do not say that cohabiting adults have no reasonable expectation of privacy in their shared residence although both have access to some if not all of the premises and either one may admit others; rather, we recognize that each has a cognizable privacy interest for Fourth Amendment purposes and that a police officer normally cannot enter without the consent of at least one resident. *See Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006); *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974). I discern no reason why the same principle ought not to hold vis-à-vis the secured common areas of a multi-unit residential building. *See United States v. Dillard*, 438 F.3d 675, 683 (6th Cir.), *cert. denied*, — U.S. —, 127 S. Ct. 291 (2006) ("Tenants have a reasonable expectation of privacy in locked common areas because a 'tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not expect trespassers.' ") (quoting *United States v. Carriger*, 541 F.2d 545, 551 (6th Cir. 1976)); *United States v. Holland*, 755 F.2d 253, 259 (2d Cir. 1985) (Newman, J., dissenting); Sean M. Lewis, Note, *The Fourth Amendment In The Hallway: Do Tenants Have A Constitutionally Protected Privacy Interest In The Locked Common Areas Of Their Apart-*

*ment Buildings?*, 101 MICH. L. REV. 273 (2002). Otherwise, by declaring that residents have absolutely no expectation of privacy in such areas, we are necessarily saying that the police are free to enter these areas without the consent of *any* resident of the building and once there walk drug-sniffing dogs up and down hallways, eavesdrop outside of individual unit doorways, and so forth. I believe that such intrusions defy the reasonable expectations of those who live in buildings with secured common areas.

A more plausible (and narrow) ground for saying that the warrantless entry in this case did not intrude upon a cognizable privacy interest might be that the hallway happened to be unlocked when Officer Lutz stepped inside. Although I would hesitate to say that Mr. Villegas and the other residents of the duplex necessarily forfeited any subjective expectation of privacy in the common hallway when they (whether inadvertently or intentionally) left the outer doors open and the inner screen doors unlocked, a police officer confronting an unlocked screen door might think that the common hallway was open to the public and, therefore, open to him as well. *See Dillard*, 438 F.3d at 682 ("By not locking the duplex's doors, Dillard did nothing to indicate to the officers that they were not welcome in the common areas."); *United States v. Mendoza*, 281 F.3d 712, 715 (8th Cir. 2002) ("In the instant case, Mendoza did nothing that would lead the officers to believe he had a protectable interest in the common area of his duplex. He made no efforts to secure the outer door."); *see also Miravalles*, 280 F.3d at 1333.

In any event, because we do not need to reach the issue, I believe it would have been more prudent to leave it for another case in which we do.

No. 05-2678

A true Copy:

    Teste:

                               _____

                               *Clerk of the United States Court of*
                                  *Appeals for the Seventh Circuit*