NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 9, 2009
Decided October 4, 2010

**Before**

JOEL M. FLAUM, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 09-1524

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | No. 1:06 CR 52 |
| MOISES ESCOBEDO, *Defendant-Appellant.* | Theresa L. Springmann, *Judge.* |

## O R D E R

To make it less suspicious in the event that Rachel Somers was pulled over on the drive he asked her to make from Arizona to Indiana, Moises Escobedo went with her to register a car that did not belong to her in her name. Sure enough, Somers was pulled over before she could even get out of Arizona. The consistency between her driver's license and the car's registration documents may have lessened the suspicion that the car contained anything illegal, but the smell of marijuana emanating from the vehicle did not. After an officer seized a trunk full of marijuana, Somers agreed to cooperate. She told officers that Escobedo had asked her to drive the marijuana to him, and she delivered the car to him in Indiana under police surveillance. By then officers had replaced the marijuana with bales of hay. Officers entered Escobedo's

home without a warrant after he discovered the hay, and he maintains the warrantless entry was improper. The government contends there were exigent circumstances that allowed the officers' entry. But even if no exigent circumstances justified the warrantless entry into the home, Escobedo receives no relief. In light of the marijuana seizure and Somers's cooperation, officers had probable cause to arrest Escobedo, which makes his statements at the police station admissible even if the entry into the home was improper. Finally, the testimony the jury heard regarding the nearly empty home was harmless in light of the other overwhelming evidence of his guilt. Therefore, we affirm his conviction.

## I. BACKGROUND

While driving with nearly 300 pounds of marijuana in the trunk, Rachel Somers made a sudden lane change without signaling in Phoenix, Arizona. An officer pulled her over and found bales of marijuana wrapped in plastic wrap and sprinkled with baby powder in the trunk. Somers agreed to cooperate and told law enforcement officials that she was driving the car to Indiana at the direction of Moises Escobedo. She stated that Escobedo had asked her to register the Crown Victoria she had been driving, in her name. He then paid for her to fly to Arizona, pick up the car, and drive it back to Indiana, which she was doing when she was pulled over. She also said he told her there would be a couple of pounds of marijuana in the trunk but that it would be packaged so a drug dog could not smell it.

Arizona officers seized the marijuana from the trunk, and Somers headed back on the road to Indiana. She stayed in regular cell phone contact with Escobedo during her drive. Law enforcement officials in Arizona sent photographs of the marijuana bundles that had been found in the trunk to the Fort Wayne, Indiana Police Department. There, Detective Fred Ray created fake bundles of hay that looked similar to the bundles of marijuana that had been in Somers's trunk. When Somers arrived in Fort Wayne, Detective Ray put the fake bundles in the trunk and sprinkled baby powder on top. Detective Ray also outfitted the vehicle with an alert beacon (a device intended to alert police when the trunk opened, although it ultimately failed in this case), and he placed a recording device on Somers.

After Somers informed Escobedo that she was in the area, he directed her to meet him in a mall parking lot. Officers performing surveillance watched Escobedo and Somers arrive in separate cars, walk toward a store, and then back to the cars. They then watched Escobedo leave in the Crown Victoria, while Somers entered the car Escobedo had been driving and headed to a nearby Burger King. An officer driving an unmarked car followed the Crown Victoria to a house on Downington Drive, about two miles away. Officers did not have this address ahead of time. Escobedo backed the car into the garage and closed the garage door. Several officers maintained surveillance on the house and watched a few other persons leave the house, look around, and then return back inside. The officers could not see the majority of the property's rear fence line. Meanwhile, Detective Ray remained at the mall lot watching

Somers. They also remained in telephone contact, and Somers told him she had a feeling she was being watched by someone associated with Escobedo.

About fifteen to twenty minutes after Escobedo arrived at the house, Somers called Detective Ray and said Escobedo had discovered the fake marijuana bales. She told him that Escobedo had called and asked her, "What is that s*** in the trunk . . . there's nothing in there . . . it's nothing but straw," and then said he would call her back. Detective Ray, who was in radio contact with surveillance officers, also attempted to call a state prosecutor for advice about obtaining a search warrant. Detective Ray then ordered a sergeant at the Downington scene to "secure the residence and all occupants," and officers entered the house without a search warrant. Somers expressed concern to Detective Ray for her safety after Escobedo's call, and he directed her to walk through the Burger King and out the other side of the restaurant to his car, where he picked her up.

The officers did not find much in the house, which had no electricity and just one piece of furniture. They did find three people, though, including Escobedo. Officers arrested him and took him to the police station. At the station, after receiving his *Miranda* warnings, Escobedo agreed to talk. He admitted that he had been hired to find someone to drive a car from Arizona to Fort Wayne. He also said that Somers and the others were not involved and that they should just arrest him for bringing the marijuana to Fort Wayne because the others did not know about it.

Escobedo filed a motion to suppress the evidence and his statements because, he argued, the warrantless search violated the Fourth Amendment. The district court denied his motion. A jury convicted Escobedo of attempted conspiracy to possess with the intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846. He received a sentence of seventy-eight months' imprisonment and four years of supervised release.

## II.  ANALYSIS

Escobedo appeals the denial of his motion to suppress evidence seized during the search of the home he rented as well as statements he made in police custody later the same day. The government agrees that Escobedo had a reasonable expectation of privacy in the recently rented house, and he maintains that the warrantless entry inside was unconstitutional. When reviewing a motion to suppress, we review factual findings for clear error and legal questions de novo. *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is a "'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). The presence of exigent circumstances is one of the few occasions when a warrantless entry is justified, and the

government maintains such circumstances exist here.

In light of the presumption that warrantless entries into a home are unconstitutional, the government bears the burden of proving that exigent circumstances existed at the time of the entry. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Exigent circumstances exist when there is a combination of "a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). One exigency supporting a warrantless entry is the need to prevent the imminent destruction of evidence. *Stuart*, 547 U.S. at 403; *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007). Here, officers had already seized the marijuana, and there was no evidence in danger of destruction. Nor does the government argue that there was. *Cf. United States v. Etchin*, 2010 WL 3024874, at *3 (7th Cir. Aug. 4, 2010) ("'[I]f police hear a crime being committed within a house (and spoilation of evidence is a crime), then they can enter immediately . . .; if they do not hear a crime (more precisely, if they do not have probable cause to believe a crime is in progress), they have to get a warrant.'") (quoting *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007)).

Another exigency occurs when there is a need to assist persons who are seriously injured or threatened with such injury. *Stuart*, 547 U.S. at 403. Officers can enter a home without a warrant to provide emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Id.* When the officers entered the home in this case, Somers was still in the mall area far away, and there was no one inside the home in danger of imminent injury.

Nonetheless, the government emphasizes that we have also said that where officers reasonably believe that their safety, or the safety of the public, may be threatened, exigent circumstances exist. *See United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996). The government justifies the warrantless entry based on a fear for Somers's safety as well as a concern that the suspects would flee the home and then present a danger to the public through their flight. With respect to concern for Somers's safety, she was never inside the Downington Drive home and instead remained in the mall area, where an officer was within approximately 100 feet from her at all times. The government argues that Escobedo might have ordered counter-surveillance on Somers and that arresting him would have prevented a telephone call from him to someone who could have been watching Somers. We recognize this concern and do not minimize the danger that counter-surveillance by a drug dealer could present. But the attempt to justify the entry out of concern for Somers's safety is less compelling in light of the fact that Detective Ray picked up Somers after Escobedo discovered the hay and then drove her to the police station. At that point she was with a police officer and not in any imminent danger. Moreover, if there had been a reasonable concern for Somers's safety, Detective Ray could have picked up Somers even sooner.

The government also argues that immediate entry was necessary because Escobedo and others inside the house might have fled, thereby posing a danger to the public and themselves during their flight. The government maintains that this home presented unique surveillance

difficulties, but a back yard fence and winding streets do not seem to differentiate it from many other suburban houses. Moreover, Escobedo had not given any indication that he was leaving.

Ultimately, whether exigent circumstances existed in this case does not matter. Nothing of substance was recovered inside the home. Rather, the incriminating evidence was the marijuana that officers had already seized, the account Somers gave law enforcement officers, and Escobedo's post-arrest statement. If Escobedo's post-arrest statement was admissible, then anything recovered inside the home was harmless. *See United States v. Simmons*, 599 F.3d 777, 780 (7th Cir. 2010) (evidentiary error harmless if reviewing court convinced that jury would have convicted absent the error).

The statement Escobedo gave after his arrest was admissible. He maintains that the post-arrest statement he made to the police at the police station was the fruit of an illegal search and should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963). The Fourth Amendment prohibits law enforcement officers from making a warrantless, nonconsensual entry into a home to effect a routine felony arrest. *Payton v. New York*, 445 U.S. 573, 576 (1980). The key word there is "home." As the Supreme Court explained in *New York v. Harris*, 495 U.S. 14, 17 (1990), "the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." Therefore, the Court held, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home," even if the statement was taken after an arrest made in the home following an improper warrantless entry. *Id.* at 21.

There was clearly probable cause to arrest Escobedo here. Probable cause exists when, at the time of arrest, the arresting officer possesses "'knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing a crime.'" *United States v. Villegas*, 495 F.3d 761, 770 (7th Cir. 2007) (quoting *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005)). Somers had informed officers that Escobedo told her she would be driving a car containing marijuana from Arizona to Indiana, the marijuana was packaged in a way to avoid a dog alert, Escodebo kept in contact with Somers throughout the drive, and he directed Somers to a meeting point upon her arrival in Fort Wayne where they switched cars in a public place. He also called her upon his surprise at discovering only hay in the trunk. Officers had probable cause to arrest Escobedo, and his statements at the police station after he waived his *Miranda* rights were admissible under *New York v. Harris* even if the warrantless entry was improper. Therefore, the district court was to correct to deny Escbobedo's motion to suppress, and we affirm his conviction.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.