# Illinois Official Reports

## Appellate Court

*People v. Martin*, 2017 IL App (1st) 143255

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK MARTIN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-3255 |
| Filed | June 12, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-18626; the Hon. Thomas Hennelly, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Brian L. Josias, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Harris and Mikva concurred in the judgment and opinion. |

¶ 1      Following a bench trial, defendant Derrick Martin was convicted of possession of a controlled substance and sentenced to five years in prison. On appeal, defendant contends the trial court erred in denying his motion to suppress evidence seized during a warrantless search. We reverse.

¶ 2      The record reveals that following an alleged drug transaction that occurred on June 9, 2013, defendant was charged with possession of a controlled substance with intent to deliver and delivery of a controlled substance. Before trial, defendant filed a motion to quash arrest and suppress evidence. In this motion, defendant stated that on June 9, 2013, police officers entered and searched the building located at 5154 West Fulton Street in Chicago without a search warrant and without consent.

¶ 3      At the hearing on the motion, defendant's mother, Perlene West, testified that she owned the two-flat building located at 5154 West Fulton. West stated that she lived on the first floor and no one currently lived on the second floor. West also testified that no one lived on the second floor on June 9, 2013. Defendant, who occasionally stayed with West, had stayed overnight with his girlfriend in West's apartment the night before June 9. West further described the building, which had a door on the outside and was surrounded by a fence with a gate. West also identified a photograph of her building. West stated that beyond the outer door were two interior doors—one to the right that led to West's apartment and one to the left that went up the stairs. According to West, the hallway area between the outer door and interior doors was a private area and not public. West stated that the building was her home and denied that anyone could just walk in. West stated that she has a "no trespassing" sign in the window of her home and that the sign was up on June 9. West also stated that the front door has a lock, and she locks it using a key. West recalled that on June 9, police officers did not have her permission to search anywhere in the building.

¶ 4      Officer Manjarrez testified that at approximately 4:26 p.m. on June 9, he was conducting a narcotics surveillance mission with Officer Collarzo in the area of 5154 West Fulton. Defendant was in a vacant lot just west of 5154 West Fulton. Officer Manjarrez observed a man, who was later identified as Dwayne Mason, approach defendant and raise his right index finger, whereupon defendant acknowledged the gesture and entered the main doorframe of 5154 West Fulton. Officer Manjarrez stated that the door to 5154 West Fulton was slightly ajar. Defendant stood on the immediate threshold and reached into the door inside of the doorframe. Defendant retrieved a blue plastic bag, manipulated it, and then retrieved a smaller unknown item from the bag. Officer Manjarrez acknowledged that he could not actually see where the bag came from and could not tell what the item was that defendant took from the bag. Defendant then placed the bag on top of the door and returned to Mason, where he received money from Mason and tendered the small unknown item. Defendant tendered the money to another male who was standing outside of 5154 West Fulton.

¶ 5      At that point, Officer Manjarrez broke surveillance and approached Mason. During a conversation, Mason stated, "I only got one blow from him" and freely tendered to Officer Collarzo a red-tinted Ziploc bag with a bomb logo that said "stay high imagine" on it. The bag contained a white powdery substance that was suspected to be heroin. Mason was placed in custody and the officers relocated to defendant, who was also placed in custody. Officer Manjarrez indicated to another officer, Officer Warner, where to recover the blue bag. Officer

Manjarrez stayed with defendant at the bottom of the stairs of 5154 West Fulton and observed Officer Warner go up the stairs. Officer Warner related that the door was open. Officer Warner reached above the doorframe on the inside of the door and recovered the blue bag. Officer Manjarrez observed that the items inside the blue bag matched the suspect narcotics that were recovered from Mason. Officer Manjarrez also stated that the item that Officer Warner recovered was from the same area where he observed defendant place the item. Additionally, Officer Manjarrez stated that once the door was open, he observed that the front door opened into a vestibule or common area that had another door, leading into the residence. The parties stipulated that the officers did not have a warrant.

¶ 6    After defendant rested, the State moved for a directed finding, contending in part that there was no expectation of privacy on the inside of the doorframe and the officers did not enter the home. In response, defense counsel contended in part that 5154 West Fulton was a private home and the area at issue was not a common area.

¶ 7    The court denied defendant's motion to quash and suppress. In its ruling, the court stated that the officer reached into the doorway of a common area of a two-flat and the officer did not enter the home. The court continued that "even assuming *arguendo,* there's plenty of probable cause based on Officer Manjarrez's observations of the transaction." The court also stated that it did not think that defendant established standing.

¶ 8    Prior to trial, defense counsel orally moved to reconsider the ruling on the motion to quash and suppress. Defense counsel stated in part that defendant's mother owned the entire building, she lived on the first floor, and no one was occupying the second floor. Defense counsel asserted that "[i]t's not your typical common area," and moreover, West had a "no trespassing" sign and the building was surrounded by a fence, which could be considered curtilage. Additionally, defense counsel stated that there were no exigent circumstances. The court denied the motion to reconsider.

¶ 9    The matter proceeded to trial. The State called as a witness Officer Manjarrez, whose testimony was substantially similar to his testimony at the hearing on defendant's motion to quash and suppress. Additionally, Officer Manjarrez stated that after he broke surveillance, he lost sight of the man who had received money from defendant.

¶ 10    Officer Warner also testified, stating that he went to the vicinity of 5154 West Fulton at Officer Manjarrez's request. Based on a conversation with Officer Manjarrez, Officer Warner searched the door and corridor of the building. Officer Warner looked in the door frame, where he found a blue bag containing five clear Ziploc bags with "Stay High" logos that contained suspect heroin. Officer Warner noted that he could not see through the bag and had to open it to see its contents. Officer Warner stated that he found the bag at the top of doorframe inside the building. Officer Warner further recalled that the blue bag was "protruding out like a piece of *** wood at the top of the door frame" and was sticking up.

¶ 11    The parties entered stipulations about the chain of custody and the chemical composition of the recovered substance. The parties stipulated that all proper chains of custody were followed. The parties also stipulated that a forensic chemist would testify that 1.4 grams of powder from five items received from the police and 0.2 grams from another item tested positive for heroin.

¶ 12    For its case, the defense called West, defendant's mother, to testify. West stated that she owned 5154 West Fulton and owned it on June 9, 2013. West identified a photograph of the inside of her hallway and stated that the photograph accurately depicted how the inside of the door leading to her home looked on June 9.

¶ 13    After closing arguments, the court issued its ruling. The court found that it was "probably more likely than not" that the item Mason gave to the officer was the item he purchased from defendant, but the evidence was insufficient to prove beyond a reasonable doubt that defendant delivered a controlled substance to Mason. The court also found that the evidence was insufficient to prove beyond a reasonable doubt that defendant was guilty of possession of a controlled substance with intent to deliver. The court stated that it had "some packaging," but nothing else, such as money, an admission, scales, or "anything that would indicate the intent to deliver." Ultimately, the court found defendant guilty of the lesser-included offense of possession of a controlled substance.

¶ 14    Prior to a sentencing hearing, defendant requested that the court reverse its finding on the motion to quash and suppress "for reasons that were stated multiple times at the hearing *** as well as the trial." The court denied the motion as well as a motion for a new trial that defendant had filed.

¶ 15    Following the sentencing hearing, defendant was sentenced to five years in prison. Defendant timely appealed.

¶ 16    On appeal, defendant contends that the trial court should have granted his motion to suppress where it erroneously concluded that Officer Warner's physical breach of the threshold of a private home from the porch of that home was not a search within the meaning of the fourth amendment. Defendant argues that per *Florida v. Jardines*, 569 U.S. ___, 133 S. Ct. 1409 (2013), Officer Warner physically intruded onto constitutionally protected areas and far exceeded the societal norms for acceptable social behavior when he searched the inside of the doorway of 5154 West Fulton. In the alternative, defendant contends that his fourth amendment rights were also violated under the expectation of privacy test set forth in *Katz v. United States*, 389 U.S. 347 (1967). Defendant also asserts that the State failed to prove consent or exigent circumstances to justify the warrantless search.

¶ 17    The fourth amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, article I, section 6 of the Illinois Constitution states that the "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, § 6; *People v. Pitman*, 211 Ill. 2d 502, 513 (2004). Illinois courts have interpreted the search and seizure provision found in the Illinois Constitution consistently with the fourth amendment jurisprudence of the United States Supreme Court. *Pitman*, 211 Ill. 2d at 513. Further, "[r]easonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Johnson*, 237 Ill. 2d 81, 89 (2010).

¶ 18    When reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *Johnson*, 237 Ill. 2d at 88. We defer to the trial court's factual findings and will reject those findings only if they are against the manifest weight of the evidence. *Id.* "However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues, and we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." (Internal quotation marks omitted.) *Id.* at 88-89. On a motion to suppress evidence, the defendant has the burden of producing evidence and proving the search and seizure were unlawful. *People v. Woodrome*, 2013 IL App (4th) 130142, ¶ 16. "[O]nce the

defendant makes a *prima facie* showing of an illegal search and seizure, the burden shifts to the State to produce evidence justifying the intrusion." (Internal quotation marks omitted.) *Id.*

¶ 19 We briefly address two preliminary matters. Defendant correctly asserts, and the State does not dispute, that defendant can claim the protection of the fourth amendment as a guest in his mother's home. See *Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (recognizing that an overnight guest in a home may claim the protection of the fourth amendment). Because it was mentioned in the trial court's ruling, we note that we no longer use the rubric of "standing" when analyzing fourth amendment claims. *Johnson*, 237 Ill. 2d at 89.

¶ 20 Turning to defendant's contentions, defendant relies on *Jardines*, 569 U.S. ___, 133 S. Ct. 1409, and the expectation of privacy test from *Katz*, 389 U.S. 347. We briefly summarize each framework. Under *Katz*, to claim the protection of the fourth amendment, a person must have exhibited an actual (subjective) expectation of privacy in the place searched or thing seized, and this expectation must be one that society is willing to recognize as " 'reasonable.' " *Id.* at 361 (Harlan, J., concurring). This test was subsequently adopted by the majority of the Supreme Court in *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Of note, Illinois courts have found that there is no reasonable expectation of privacy in common areas of apartment buildings that are accessible to others. See *People v. Smith*, 152 Ill. 2d 229, 245 (1992) (no reasonable expectation of privacy in a conversation that occurred in an apartment building's unlocked common area that was shared by other tenants, the landlord, their social guests, and other invitees); *People v. Carodine*, 374 Ill. App. 3d 16, 23 (2007) (the defendant had no reasonable expectation of privacy in the dryer vent of his three-unit apartment building where dryer vent was in a common area that was accessible to the landlord and other members of the general public); *People v. Lyles*, 332 Ill. App. 3d 1, 7 (2002) (stating that a tenant has no reasonable expectation of privacy in common areas of an apartment building that are accessible to other tenants and their invitees).

¶ 21 In *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1413, the Court considered whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of a home was a "search" within the meaning of the fourth amendment. The Court stated that pursuant to *Katz*, "property rights 'are not the sole measure of Fourth Amendment violations.' " *Id.* at ___, 133 S. Ct. at 1414. The Court continued that "though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.' " (Emphasis in original.) *Id.* The Court first considered whether the officers' investigation took place within a constitutionally protected area. *Id.* at ___, 133 S. Ct. at 1414-15. The Court stated that the area " 'immediately surrounding and associated with the home,' " known as curtilage, was " 'part of the home itself for Fourth Amendment purposes.' " *Id.* at ___, 133 S. Ct. at 1414. The Court then assessed whether the officers' investigation "was accomplished through an unlicensed physical intrusion." *Id.* at ___, 133 S. Ct. at 1415. The Court stated that a police officer without a warrant "may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Id.* at ___, 133 S. Ct. at 1416. Ultimately, the Court found that the use of trained police dogs to investigate a home and its immediate surroundings was a "search" within the meaning of the fourth amendment. *Id.* at ___, 133 S. Ct. at 1417-18.

¶ 22 The Illinois Supreme Court applied *Jardines* to a 12-unit apartment building in *People v. Burns*, 2016 IL 118973. There, the court considered whether the warrantless use of a drug-detection dog, located in a locked apartment building in the middle of the night, violated

the defendant's fourth amendment rights. *Id.* ¶ 16. The dog sniff occurred outside the defendant's apartment door. *Id.* ¶ 7. The State in *Burns* suggested that *Jardines* did not apply to leased apartments or condominiums because there is no legitimate expectation of privacy in the common areas of multi-unit dwellings. *Id.* ¶ 32. Disagreeing with the State, the court noted that the entrances to the apartment building were locked and the common areas were not open to the general public. *Id.* ¶ 33. The court also found that the landing to the defendant's apartment was curtilage, noting that the landing was directly in front of the apartment and a clearly marked area within a locked building with limited use and restricted access. *Id.* ¶¶ 35, 39. The court stated that the police conduct in the case "certainly exceeded the scope of the license to approach [the] defendant's apartment door," as the officers entered a locked building in the middle of the night and remained in the building for more than a very short period of time. *Id.* ¶ 43.

¶ 23    Although *Burns* applied *Jardines* to a multi-unit apartment building, the specific contours of *Jardines* are unsettled. This much was recognized by the Seventh Circuit in *United States v. Whitaker*, 820 F.3d 849 (7th Cir. 2016). While the court stated that "[t]he practical effects of *Jardines* *** weigh in favor of applying its holding to dog sniffs at doors in closed apartment hallways," the court questioned how *Jardines* would apply to "the middle ground between traditional apartment buildings and single-family houses," including split-level duplexes, buildings that were converted from houses to apartments, and garden apartments whose doors open directly to the outdoors. *Id.* at 854. The court further stated that "a strict apartment versus single-family house distinction" was troubling because it would apportion fourth amendment protections on grounds that correlate with income, race, and ethnicity, citing data showing that a smaller percentage of African-Americans and Hispanics live in one-unit detached houses than whites and that the percentage of households that live in one-unit, detached houses rises with income. *Id.*

¶ 24    Thus, under both *Katz* and *Jardines*, the type of building at issue matters. Here, the State and defendant dispute how to characterize 5154 West Fulton, with the State asserting that it is a multi-unit apartment building and defendant contending that it is a single-family home. Our research has not revealed an Illinois case that considered for fourth amendment purposes how to characterize the type of building here—a two-flat owned and occupied by one family. Where there is no Illinois authority on a point, we may look to other jurisdictions for guidance. *People v. $111,900 United States Currency*, 366 Ill. App. 3d 21, 30 (2006). Cases from other jurisdictions that indicate there are greater expectations of privacy in duplexes owned and occupied by one family persuade us that 5154 West Fulton should be treated as a single-family home for fourth amendment purposes. In *United States v. Villegas*, 495 F.3d 761, 764, 767 (7th Cir. 2007), the Seventh Circuit considered whether the defendant had a reasonable expectation of privacy in the common hallway of his duplex, which was owned by the defendant's sister. The first floor unit was occupied by the defendant and his sister and the second floor unit was occupied by a couple that was unrelated to the defendant and his sister. *Id.* at 764. In finding that the defendant did not have a reasonable expectation of privacy in the hallway, the court noted that the defendant did not "present any evidence that suggests that he and his sister were related to [the couple], such that the duplex in its entirety should be considered a single dwelling." *Id.* at 768. The court also noted that fact-dependent nature of the inquiry into the reasonableness of a person's expectation of privacy in a particular place. *Id.* at 769.

¶ 25    In *United States v. King*, 227 F.3d 732 (6th Cir. 2000), the Sixth Circuit considered the unique setting of a duplex entirely occupied by members of the same family. There, defendant's mother lived on the second floor with some of her other children, while defendant and other family members lived on the other floors of the building. *Id.* at 738. The court concluded that defendant had a legitimate expectation of privacy in the basement area of the building. *Id.* at 750. The court found that the fact that the building was a two-family dwelling made it more likely that the basement area was not a common area for purposes of fourth amendment protection. *Id.* at 749. Additionally, the court stated that "the nature of the living arrangements of a duplex *** affords the tenant of the duplex a greater expectation of privacy in areas the tenant of the multi-unit apartment building would not enjoy" because in a duplex, access to those areas is limited to the duplex's tenants and the landlord. *Id.* at 750.

¶ 26    Extending the reasoning of *Villegas* and *King*, the record indicates that 5154 West Fulton should be treated as a single-family home. West stated that she owned the building and lived on the first floor, and on June 9 and at the time of the hearing, no one lived on the second floor. She also stated that defendant occasionally stayed with her and had stayed overnight the previous evening. Beyond the building being occupied by one family, it was also owned by a member of that family. Further, West testified that the building was her home and denied that anyone could walk in. She had a "no trespassing" sign in the window. She also stated that the space between the outer and interior doors was private. Although the front door was slightly ajar on June 9, West stated that she locks the front door with a key. 5154 West Fulton was not a typical multi-unit building where numerous tenants and members of the public were expected to enter. Rather, it was viewed as the family home, and we will treat it as such for the purposes of this case. See also *United States v. Werra*, 638 F.3d 326, 336 (1st Cir. 2011) (the defendant had a reasonable expectation of privacy where the defendant believed the entire house, and not just the third floor, served as his home, and shared living arrangements with housemates).

¶ 27    We now apply *Jardines* to the officers' actions at 5154 West Fulton. The first question is whether the officers' investigation took place in a constitutionally protected area. *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1414-15. The Supreme Court stated that at the very core of the fourth amendment is the " 'right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Id.* at ___, 133 S. Ct. at 1414. Additionally, as noted above, the area " 'immediately surrounding and associated with the home,' " known as curtilage, is considered part of the home itself for fourth amendment purposes. *Id.* at ___, 133 S. Ct. at 1414. In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court listed four factors to consider when defining the extent of a home's curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passersby. These factors are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

¶ 28    Here, Officer Warner recovered an item from above the inside doorframe of the outer door of 5154 West Fulton. Although the area beyond the outer doorway led to two apartment doors, we determined above that the entire building is a single-family home, which includes the area above the inside doorframe. As "the Fourth Amendment has drawn a firm line at the entrance to the house" (*Payton v. New York*, 445 U.S. 573, 590 (1980)), the area above the inside

doorframe was a constitutionally protected area. Further, to the extent that Officer Warner stood on top of the steps outside 5154 West Fulton, that area outside the door was akin to a porch, which is a "classic exemplar" of curtilage. See *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1415.

¶ 29    The next question is whether the officers' actions were accomplished through an unlicensed physical intrusion. *Id.* at ___, 133 S. Ct. at 1415. A police officer without a warrant may approach a home and knock because that is no more than any private citizen might do. *Id.* at ___, 133 S. Ct. at 1416. Further, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at ___, 133 S. Ct. at 1416. Here, Officer Warner went up the stairs of 5154 West Fulton, reached above the inside doorframe, and recovered a blue bag. This was well beyond what an ordinary private citizen could do, where Officer Warner physically intruded on the inside of the home to gather evidence. See *id.* at ___, 133 S. Ct. at 1417 (officers' behavior objectively revealed a purpose to conduct a search, "which is not what anyone would think he had license to do"). That the door was open does not change this result. A private citizen would not think that he could breach the open door of a home and investigate its contents.

¶ 30    The State asserts that in contrast to *Jardines* and *Burns*, Officer Warner did not use a drug-detection dog and merely reached his hand across the threshold of the exterior door. However, "when the government uses a physical intrusion to explore details of the home ***, the antiquity of the tools that they bring along is irrelevant." *Id.* at ___, 133 S. Ct. at 1417. Further, any physical invasion of the home's structure by even a fraction of an inch is too much. *Kyllo v. United States*, 533 U.S. 27, 37 (2001). Officer Warner exceeded what a private citizen was permitted to do at the front door of 5154 West Fulton.

¶ 31    The State further contends that Officer Warner's recovery of the contraband did not constitute a search pursuant to the plain view doctrine. The plain view doctrine supplements a prior valid reason for being present and permits the warrantless seizure of evidence in plain view because it does not constitute a general, intrusive invasion of a person's privacy. *People v. Hassan*, 253 Ill. App. 3d 558, 569 (1993). Three requirements must be met to apply the plain view doctrine: (1) the officers must be lawfully in a position from which they view the object; (2) the incriminating character of the object must be immediately apparent; and (3) the officers must have a lawful right of access to the object. *People v. Jones*, 215 Ill. 2d 261, 271-72 (2005). "[I]f police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object, *i.e.*, if the incriminating character of the object is not immediately apparent, the plain view doctrine cannot justify the seizure." *Id.* at 272. Here, the incriminating nature of the blue bag that was recovered above the doorframe was not immediately apparent. Officer Manjarrez testified that when he observed the transaction between Mason and defendant, defendant retrieved a small item from the blue bag and then tendered a small unknown item to Mason. Officer Manjarrez could not identify the item that defendant retrieved from the blue bag. It was only after Officer Warner recovered the bag that Officer Manjarrez saw that the items inside matched the suspect narcotics that were recovered from Mason. Because the nature of the object was not immediately apparent, the plain view doctrine does not justify the seizure.

¶ 32    We conclude that the officers' conduct was a warrantless search under *Jardines*. Defendant also challenges the officers' conduct under *Katz*, which " 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment." (Emphases in

original.) *Jardines*, 569 U.S. at ___, 133 S. Ct. at 1417. As a result, because we found that the officers gained evidence by physically intruding on a constitutionally protected area, we do not need to decide whether the officers' conduct violated defendant's expectation of privacy under *Katz. Id.* at ___, 133 S. Ct. at 1417.

¶ 33    A warrantless search is permissible if it fits within a specifically established and well-delineated exception to the warrant requirement. *People v. Hand*, 408 Ill. App. 3d 695, 700 (2011). Accordingly, the State raises an exception here—that the warrantless search was justified by probable cause and exigent circumstances. See *People v. Hunley*, 313 Ill. App. 3d 16, 22 (2000) (police are not required to obtain a warrant to enter a home if exigent circumstances exist). The State argues that exigent circumstances existed because the officers saw defendant give money to an unknown man, but lost track of the man after they broke surveillance and arrested Mason and defendant. According to the State, the officers reasonably believed that the unknown man knew of their presence, but did not know whether the man went inside 5154 West Fulton, where he could destroy the evidence.

¶ 34    The State bears the burden to demonstrate that exigent circumstances authorized the warrantless entry. *Id.* Relevant factors for determining whether exigent circumstances were present to effectuate an arrest include whether (1) the crime under investigation was recently committed, (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained, (3) a grave offense was involved, particularly a crime of violence, (4) there was reasonable belief that the suspect was armed, (5) the police officers were acting on a clear showing of probable cause, (6) it was likely that the suspect would escape if he was not swiftly apprehended, (7) there was strong reason to believe that the suspect was in the premises, and (8) the nonconsensual entry was made peaceably. *People v. McNeal*, 175 Ill. 2d 335, 345 (1997). Another consideration is whether the evidence would likely disappear without prompt action. *People v. Smith*, 152 Ill. 2d 229, 249 (1992). No list of factors is exhaustive and the factors listed above are guidelines, rather than cardinal maxims to be applied rigidly in each case. *McNeal*, 175 Ill. 2d at 345. "The cornerstone of an exigency analysis is whether the police officers acted reasonably," a determination we make by considering the totality of the circumstances confronting the officers when the entry was made. *People v. Wimbley*, 314 Ill. App. 3d 18, 24 (2000).

¶ 35    Here, there were no exigent circumstances to justify the warrantless entry. We acknowledge that the crime under investigation was recently committed, the entry was peaceable, and there was probable cause to believe that defendant committed a crime and that evidence was in the home. Further, the record does not suggest that the police delayed their entry. However, the circumstances indicate that the officers could have obtained a warrant without risk that the evidence would be destroyed. If the destruction of narcotics is the primary motivation for the warrantless entry, the police must have particular reasons to believe that the evidence will be destroyed for exigent circumstances to arise. *Hassan*, 253 Ill. App. 3d at 572. The State did not provide those particular reasons. After Officer Manjarrez broke surveillance and spoke to Mason, both Mason and defendant were placed in custody. Officer Manjarrez stayed with defendant at the bottom of the stairs of 5154 West Fulton, while Officer Warner recovered the blue bag. Defendant did not have access to the evidence at that point. The State points to the unknown man to whom defendant gave money and asserts that it was reasonable to believe that the man knew of the officers' presence and went inside the residence, where he could have destroyed the evidence. This is entirely speculative. Further, there were multiple

officers at the scene who could have secured the premises while a warrant was obtained. Under these circumstances, we decline to find that exigent circumstances justified the warrantless entry. See *People v. Payton*, 317 Ill. App. 3d 909, 914 (2000) (no exigent circumstances to justify warrantless search where officers could have asked for consent, and if consent were denied, officers could have secured the area to prevent any tampering while a warrant was obtained).

¶ 36     Additionally, we are not persuaded by the State's reliance on *People v. Slavin*, 2011 IL App (2d) 100764, and *People v. Pierini*, 278 Ill. App. 3d 974 (1996). In *Slavin*, 2011 IL App (2d) 100764, ¶¶ 1, 6, a police officer conducted a warrantless search of an ice fishing shanty after suspecting that the occupants were smoking cannabis inside. The court found that the search was justified by exigent circumstances because another officer could not have been called to monitor the scene while a warrant was obtained, as the suspected cannabis likely would have been removed or destroyed by smoking it or dropping it through a hole into the water below the shanty. *Id.* ¶ 23. Here, in contrast, there were already multiple officers on the scene to secure and monitor the residence, and defendant was already detained away from the suspected narcotics. In *Pierini*, 278 Ill. App. 3d at 978-79, exigent circumstances justified a warrantless search of an apartment for cannabis where the officers' presence was known to the defendant and his wife, who were in the apartment in the immediate vicinity of the contraband. Here, again, defendant was detained outside the residence, and there was no evidence that the unknown man was in the residence, much less near the suspected narcotics. Exigent circumstances did not justify the warrantless search of 5154 West Fulton.

¶ 37     Next, the State contends that even if the fourth amendment was violated, the recovered evidence should not be suppressed because the officers acted in good-faith reliance on binding precedent when they seized the drugs. The State argues that the officers conducted the search in objectively reasonable reliance on First District precedent set forth in *People v. Carodine*, 374 Ill. App. 3d 16 (2007), and *People v. Lyles*, 332 Ill. App. 3d 1 (2002), which it asserts held that common areas open to other tenants, invitees, salesmen, and others were not constitutionally protected under the fourth amendment.

¶ 38     The fourth amendment is silent about suppressing evidence obtained in violation of its command. *Davis v. United States*, 564 U.S. 229, 236 (2011). That rule—the exclusionary rule—was created by the Supreme Court to "compel respect for the constitutional guaranty," but is not a personal constitutional right and was not designed to "redress the injury" caused by an unconstitutional search. (Internal quotation marks omitted.) *Id.* The rule's purpose is to deter future fourth amendment violations. *Id.* at 236-37. Exclusion is a last resort, and the exclusionary rule applies when the deterrent benefits outweigh its heavy costs. *People v. LeFlore*, 2015 IL 116799, ¶ 23. "Where the particular circumstances show that police acted with an objectively reasonable good-faith belief that their conduct [was] lawful, or when their conduct involved only simple, isolated negligence, there is no illicit conduct to deter." (Internal quotation marks omitted.) *Id.* ¶ 24. One instance where evidence is not excluded despite a fourth amendment violation is when the police conduct a search in objectively reasonable reliance on binding appellate precedent. *Davis*, 564 U.S. at 249-50. See also *LeFlore*, 2015 IL 116799, ¶ 29 (applying *Davis*). Under this analysis, an officer's subjective awareness of the law is irrelevant. *People v. Harrison*, 2016 IL App (5th) 150048, ¶ 26.

¶ 39     Here, we decline to apply the good-faith exception stated in *Davis*. *Carodine* and *Lyles* involved the common areas of multi-unit apartment buildings that were accessible to others.

See *Carodine*, 374 Ill. App. 3d at 23; *Lyles*, 332 Ill. App. 3d at 7. Thus, the State's contention rests on the assumption that 5154 West Fulton was also a multi-unit apartment building and that the area searched was accessible to others, but does not point to facts that support a reasonable belief that this was the case. See *People v. Bravo*, 2015 IL App (1st) 130145, ¶ 20 (good-faith exception did not apply where prosecutor did not present evidence that would excuse conduct based on alleged precedent). Rather, the evidence at the hearing indicated that 5154 West Fulton was a single-family home. *Carodine* and *Lyles* thus do not apply, and the State cannot rely on them to excuse the officers' warrantless search. We recognize that the lines between single-family homes and multi-unit apartment buildings may not always be crystal clear, but an officer working under non-exigent circumstances can always satisfy fourth amendment requirements by presenting evidence of probable cause to a neutral magistrate and obtaining a warrant. See *United States v. Holland*, 755 F.2d 253, 259-60 (2d Cir. 1985) (Newman, J., dissenting).

¶ 40 With no basis for avoiding the exclusionary rule, we find that the evidence in this case should have been suppressed. Further, without the suppressed evidence of the narcotics, the State cannot prove that defendant possessed the narcotics and his conviction must be reversed outright. See *People v. Sims*, 2014 IL App (1st) 121306, ¶ 19; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 20.

¶ 41 For the foregoing reasons, the judgment of the circuit court is reversed.

¶ 42 Reversed.